## Case No. 2,092.

### BUCKLEY v. BROWN.

[3 Wall. Jr. 199;[1] 13 Leg. Int. 304; 19 Leg. Int. 364.]

Circuit Court, E. D. Pennsylvania. Oct. Term, 1856.

ADMIRALTY JURISDICTION—CANAL BOATS—MARINE HOSPITAL TAX.

1. The character of a boat, i. e., the question whether a boat is a canal boat or a vessel of another kind, is to be determined by her build, object, and general and ordinary purposes and uses, and not upon the fact whether she is found, for part of her voyages or occasionally, in tide waters, and is moved on them by steam. If she is a canal boat in common and just parlance, she does not become a steamboat, or anything but a canal boat, by being pulled or pushed by a steam tug.

2. "Canal boats," as their character is settled by this rule, "without masts or steam power," are not liable to pay the "marine hospital tax" laid on registered vessels, by Act July 16, 1798 [1 Stat. 606], § 2; a subsequent act (Act July 20, 1846 [9 Stat. 38], § 1) exempting "canal boats" of this character from its operation.

[In admiralty. Suit to recover marine hospital tax, alleged to have been illegally exacted. Decree for plaintiff.]

An early act of congress (Act July 16, 1798 [1 Stat. 606], § 2) enacts "that no collector shall grant to any vessel whose license for carrying on the coasting trade has expired, a new license, before the master of such vessel shall first render a true account to the collector of the number of seamen, and the time they have severally been employed on board such ship or vessel, during the continuance of the license which has so expired, and pay to such collector twenty-five cents for every month such seamen have been severally employed as aforesaid." The sum thus paid is retained from the wages of the seamen, and is to form a hospital fund for the support and maintenance of disabled seamen. Under this act it had been the practice prior to 1846, to tax, indiscriminately, all hands and mariners engaged on boats and vessels trading on our rivers. This tax became a great burden to canal boats and vessels engaged in the inland navigation of Pennsylvania; and to relieve them from this burden, congress, by an act of the 20th July, 1846, enacted: Sec. 1. "That persons employed in navigating canal boats without masts or steam power, shall not be required to pay any marine hospital tax or money." [Nor shall the persons employed to navigate such boats receive any benefit or advantage from the marine hospital fund; nor shall such owner or owners, captain, or other persons be required to pay fees, or make any compensation for such register, license, or enrollment license; nor shall any such boat be subject to be libelled in any of the United States courts for the wages of any person or persons who may be employed on board thereof, or in navigating the same.][2] Sec. 2. "That all acts and parts of acts repugnant to the provisions of this act be, and the same are hereby repealed." In practising upon this act of congress, the secretary of the treasury issued to the collectors of the different ports of the United States, instructions to the effect: First. That under the act of 20th July, 1846, vessels or boats which ply altogether on tide and other navigable waters, cannot be deemed canal boats, entitled to the privileges of that act. Second. That the exemption of canal boats cannot extend to boats or barges, exceeding fifty tons, although without masts or steam power within themselves, when the usual practice of such boats or barges, is to come out of the canals, and trade by aid of steamboats and propellers, on natural navigable waters from district to district." With these laws and instructions in force, the plaintiff, being captain of a registered boat, applied to the defendant, collector of the port of Philadelphia, for a renewal of a license, which that officer, acting on the instructions of the treasury, refused to give him without a previous payment of the usual "marine hospital tax." The boat was in the ordinary canal shape, of 123 tons burden, without masts or steam; and her voyages were between Port Carbon, an interior town among the Pennsylvania coal hills, and the city of New York, by way of the Schuylkill Navigation Company, and the Delaware and Raritan canal. Her whole distances were 228 miles, of which 151 were on canal, and 77 on tide water, on which last she was towed by steam tugs. The captain, having paid the money under protest, the right of the collector to have demanded it was the question now before this court, to which it came by certiorari from the common pleas.

Mr. Vandyke, D. A. U. S., for the collector.

The act of 1798 has not been repealed. It applies to the plaintiff and his boat, unless the boat comes within the exceptions of the act of 1846. The privileges of that act are confined not to canal boats generally, nor to any at all times, but to such boats, being "without masts or steam power." The boat must be bonâ fide a canal boat, and prove her quality by staying on canals: and using neither steam nor masts; else by giving to river and steamboats the form, size and name of canal boats, river boats would go clear entirely. Even if an ordinary canal boat navigates rivers chiefly, it was never meant that she should go clear. The act of 1846 makes steam the test. It matters not how steam is applied; whether in front, and

---

[1] [Reported by John William Wallace, Esq., and here reprinted by permission.]

[2] [From 13 Leg. Int. 364.]

so pulls the boat, or behind, and so pushes it, or on board, and so propels it. If steam moves the boat entirely, and on tide waters, the boat is not a canal boat within the meaning of the act of 1846; an exceptional act, as has been stated, and in derogation of the rights of the government. Vessels are now made in compartments. The steam is on one, the freight on others, the passengers on the remaining. The different parts of the vessel are attached; but in structure are as separate as the canal boat and the tug.

Mr. W. M. Tilghman, on the other side, contended that whether a boat was a canal boat or not, depended simply on the fact what sort of navigation she was constructed and adapted for. If, tested by these rules, she was a canal boat, she was a canal boat wherever she was, whether on a canal, on a tide river, or on dry land; and no more became a steamboat because she got out on tide water and was towed by a steam tug, than she would become a railroad car by being put on the wheels of railroad trucks and rolled over a railroad; or a dwelling house, by the canal's becoming emptied of water, and the boat left on dry land. Certainly, the act made "steam power" a test; but it means steam power as part of the boat. This boat was as much a "canal boat without steam power," after she was tied to the tug, as she was before; and just as much as she would have been "without masts," if she had been tied to a sailing vessel propelled by wind. It is the tug and the sailing vessel which have the steam and the masts. The canal boat has neither, and therefore, of course, is "without" them, and so exempt. Though an exceptional act, the act of 1846 is to be construed fairly, and like ordinary acts, and its meaning is to be settled by the courts, and not by secretaries of the treasury, who look to that which chiefly concerns them, government interests.

GRIER, Circuit Justice. It is a great grievance that the revenue laws passed by congress have become so numerous and complicated, that it is often difficult to ascertain what is the existing law on any particular subject. In the construction of other laws, when one statute supplies or changes the provisions of another, the latest is construed as a repeal of the former. But on the construction of this mass of contradictory revenue laws, it would seem that the statute which gives the highest duty, the largest fees, or the severest penalties, is never repealed by a later act which mitigates the penalty or diminishes the fees. Acts giving certain fees or forfeitures to certain officers, become almost like the laws of the Medes and Persians, incapable of being repealed. At least, it is hard for human ingenuity to discover language for the purpose which may not be perverted by ingenious misconstructions. [This case raises the question of the construction of an act of congress which declares that "the owner, master, or captain, or other persons employed in navigating canal boats without masts or steam power, &c., shall not be required to pay certain fees, nor marine hospital tax, and shall receive no benefit from the marine hospital fund, &c."] [3]

It is part of the history of this act of congress, that it was originated at the instance chiefly, and for the relief of a certain class of citizens of the commonwealth of Pennsylvania.

Much of the internal trade of this country, which was formerly carried on wagons over turnpikes, or by coasting vessels trading from port to port, is now carried on by means of canal boats. In the transportation of coal, these boats are loaded among the mountains, dragged by horses or mules down to the harbor of Philadelphia, towed from the harbor to the New Jersey canal, again dragged by animal power, to be again tugged or towed into the harbor of New York. The trade thus carried on is entirely internal, as much so as if done by wagon or railroad car, and calling as little for the interference of the revenue laws. There is nothing of a maritime character about this mode of transportation, save the boat. The persons who conduct or navigate it, the steersman of the boat, his assistant, the man or boy who drives the mule, have probably never seen the sea, till their arrival at New York. They are, therefore, astonished to find that, as soon as their boat touches brackish water, it has become the subject of a new code of laws, originating in Rhodes or Italy, and in the isles of Oleron and Rhe; that though born and bred mountaineers they have, by magic, become mariners, and may libel the coal boat for their wages, or hypothecate it for oats and provision, on the return voyage, &c., &c., and a thousand other incidents of admiralty jurisdiction, and custom house supervision and fees, which have about as much application to them and their boats as they have to Conestoga wagons.

For the purpose of relieving trade from these annoyances of admiralty law and custom house exactions, this act of congress was passed, and the question for the courts to decide in this case is, whether we can by any ingenuity so construe, or rather misconstrue, it as to render it wholly ineffectual. It is proposed to do it by means of the following sorites or syllogisms: A canal boat is a canal boat only while it continues to be a boat on a canal; and although it has no mast or steam engine on board, yet when a steam tug is attached to it by a rope for the purpose of taking it from part of a harbor or river to another, it becomes ipso facto a steamboat, because it has been tugged or propelled by steam, and so remains ever after, it having lost the character of canal boat

---

[3] [From 13 Leg. Int. 364.]

forever, by a single contact with the rope of a steam tug. The man, the boy and the mule, are thus converted into mariners, and entitled to libel for wages in admiralty, and to an interest in the marine hospital fund. Ergo, they are bound to pay the same fees as were exacted before this act was passed.

The objections to this reasoning and conclusion are, that they shock common sense, and annul an act of congress specially made to apply to these very persons and things.

Consequently the fees exacted from the plaintiff were illegally exacted, and he is entitled to recover according to the conditions of the case. Decree accordingly.